[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-10676
_____

D.C. Docket No. 0:09-cr-60331-JIC-1

In Re: ROTHSTEIN, ROSENFELDT, ADLER, P.A.,
        a.k.a. RRA,

                                                                          Debtors.

_____

UNITED STATES OF AMERICA,

                                                                Plaintiff - Appellee,

versus

SCOTT W. ROTHSTEIN,

                                                                Defendant - Appellee.

TODD D. SNYDER,

                                                Intervenor-Interested Party-Appellee,

HERBERT STETTIN,
Chapter 11 Trustee,

                                                                Interested Party - Appellant,

REGIONS BANK,

Petitioner,

SOLAR AIR, INC.,

Interpleader.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 12, 2013)

Before TJOFLAT and MARTIN, Circuit Judges, and BUCKLEW,[*] District Judge.

TJOFLAT, Circuit Judge:

A number of criminal statutes within the Federal Code mandate that a defendant, when convicted, forfeit to the United States as part of his sentence the lucre he acquired as a result of his criminal activity.  In this case, the defendant, a lawyer, deposited the lucre in his law firm's bank accounts, where it was commingled with the firm's receipts from legitimate clients.  The question this appeal presents is whether the money in the bank accounts at the time the defendant was charged is subject to forfeiture.  We hold that it is not.

---

[*] Honorable Susan C. Bucklew, United States District Judge for the Middle District of Florida, sitting by designation.

I.

A.

On November 10, 2009, four creditors of a Miami, Florida, law firm of seventy attorneys, Rothstein, Rosenfeldt and Adler P.A. ("RRA"), petitioned the Bankruptcy Court for the Southern District of Florida to reorganize the law firm under Chapter 11 of the United States Bankruptcy Code.[1]  Two weeks later, the Bankruptcy Court appointed Herbert Stettin trustee of the bankruptcy estate (the "Trustee").  On December 1, 2009, the United States Attorney for the Southern District of Florida filed a five-count information charging Scott Rothstein, "a shareholder, Chairman and CEO of RRA,"[2] with conspiring to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c),[3] by employing RRA to engage in a pattern of racketeering activity, principally mail and wire fraud and money laundering, and with conspiring to commit those substantive offenses.[4]  These charges were based on a common allegation that Rothstein operated a "Ponzi" scheme[5] by

---

[1]  11 U.S.C. § 101 et seq. (2006).

[2]  Information, Record, vol. 1, no. 1, at 4, ¶ 7.A.

[3]  RICO was enacted by section 901(a) of the Organized Crime Control Act of 1970 (Pub. L. No. 91–452, 84 Stat. 922, enacted October 15, 1970), and is codified as Chapter 96 of Title 18 of the United States Code, 18 U.S.C. §§ 1961–1968.

[4]  Count 1 alleged a violation of 18 U.S.C. § 1962(d), which provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  Count 1 alleged that Rothstein conspired to violate subsection (c) which states

3

that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  According to Count 1, RRA was the "enterprise," and the "pattern of  racketeering activity" included mail fraud, wire fraud, and money laundering in the execution of the Ponzi scheme described in the text following this footnote.

Count 2 alleged a violation of 18 U.S.C. § 1956(h), a conspiracy to violate 18 U.S.C. §§ 1956 and 1957.  Section 1956, "Laundering of monetary instruments," states, in pertinent part:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--
>
>> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or
>
> . . . .
>
>> (B) knowing that the transaction is designed in whole or in part--
>>> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
>>> (ii) to avoid a transaction reporting requirement under State or Federal law,
>
> shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

The term "specified unlawful activity" includes mail fraud and wire fraud.  18 U.S.C. § 1956(c)(7).  According to Count 2, Rothstein, in executing his Ponzi scheme, laundered the money he received from his investors by depositing it in RRA's bank accounts.

Section 1957, "Engaging in monetary transactions in property derived from specified unlawful activity," makes it unlawful to "engage[] or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity."  18 U.S.C. § 1957(a).  According to Count 2, Rothstein structured his deposits into RRA's bank accounts in an effort to avoid violating § 1957.

Count 3 alleged that Rothstein conspired to violate 18 U.S.C. §§ 1341 and 1343 under 18 U.S.C. § 1349, which makes such conspiracy an offense against the United States.  According to Count 3, the object of Rothstein's conspiracy was the execution of his Ponzi scheme via the U.S. mail and interstate wire systems.

Counts 4 and 5 alleged two violations of 18 U.S.C. § 1343.  Each count alleged that Rothstein transmitted to a bank by wire funds he had fraudulently obtained in executing his Ponzi scheme.

4

fraudulently inducing investors through the use of false statements, documents, and computer records to (1) loan money to purported borrowers based upon fraudulent promissory notes and fictitious bridge loans, and (2) invest funds based upon anticipated pay-outs from purported confidential settlement agreements which had been reached between and among certain individuals and business entities. These settlement agreements were falsely presented as having been reached between putative plaintiffs in civil cases and putative defendants based upon the forbearance of civil claims in sexual harassment and/or whistle-blower cases.

Information, Record, vol. 1, no. 1, at 4, ¶ 7.A. In addition to seeking Rothstein's conviction for these offenses, the information sought the forfeiture of his interests in the numerous properties, including RRA's bank accounts at Gibraltar Private Bank and Trust ("Gibraltar Bank") and Toronto Dominion Bank, N.A. ("TD Bank"), listed in the information (and the Appendix of this opinion), on the theory that such interests constituted proceeds of Rothstein's Ponzi scheme or property acquired with such proceeds.[6]

---

[5] The "modus operandi of a Ponzi scheme is to use newly invested money to pay off old investors and convince them that they are earning profits rather than losing their shirts." United States v. Orton, 73 F.3d 331, 332 (11th Cir. 1996) (internal quotations omitted).

[6] On January 10, 2010, the list of properties in the information was augmented with a bill of particulars. For ease of discussion, we treat the bill of particulars as part of the information.

The information alleges that the Government was entitled to forfeiture under 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 1963. Record, vol. 1, no. 1, at 18, ¶ 5.

Section 981(a)(1)(C), as made applicable by 28 U.S.C. § 2461, allows for the criminal forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." See United States v. Padron, 527 F.3d 1156, 1162 n.6 (11th Cir. 2008) ("28 U.S.C. § 2461(c) makes criminal remedies available in the civil context, and . . . criminal forfeiture proceedings are in personam."). Such "specified unlawful activity" includes "any act or activity constituting an offense listed in

Five days after filing the information against Rothstein, the Government

moved the District Court pursuant to 18 U.S.C. § 1963(d)(1)(A)[7] and 21 U.S.C.

_____

§ 1961(1) of this title," among which is 18 U.S.C. § 1343, which Counts 4 and 5 charge
Rothstein with violating. 18 U.S.C. § 1956(c)(7)(A).

      Section 982(a)(1) applies to Count 2, which charges Rothstein with conspiracy to violate
18 U.S.C. §§ 1956 and 1957. Section 982(a)(1) states: "The court, in imposing sentence on a
person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order
that the person forfeit to the United States any property, real or personal, involved in such
offense, or any property traceable to such property."

      Section 1963(a), which applies to Count 1, states, in pertinent part:

      (a) Whoever violates any provision of section 1962 of this chapter . . . shall forfeit
      to the United States, irrespective of any provision of State law—

         (1) any interest the person has acquired or maintained in violation of section
         1962;
         (2) any—
             (A) interest in;
             (B) security of;
             (C) claim against; or
             (D) property or contractual right of any kind affording a source of
             influence over;
             any enterprise which the person has established, operated, controlled,
             conducted, or participated in the conduct of, in violation of section 1962;
             and
         (3) any property constituting, or derived from, any proceeds which the person
         obtained, directly or indirectly, from racketeering activity or unlawful debt
         collection in violation of section 1962.

[7] 18 U.S. C. § 1963 states, in pertinent part:

(d)(1) Upon application of the United States, the court may enter a restraining
order or injunction, require the execution of a satisfactory performance bond, or
take any other action to preserve the availability of property described in
subsection (a) for forfeiture under this section—

      (A) upon the filing of an indictment or information charging a violation of
      section 1962 of this chapter and alleging that the property with respect to
      which the order is sought would, in the event of conviction, be subject to
      forfeiture under this section . . . ; or
      (B) prior to the filing of such an indictment or information, if, after notice to
      persons appearing to have an interest in the property and opportunity for a
      hearing, the court determines that--

         (i) there is a substantial probability that the United States will prevail on
         the issue of forfeiture and that failure to enter the order will result in the

6

§ 853(e)(1)(A)[8] to enter an order restraining Rothstein and RRA  from disposing of any of the property listed in the information, including RRA's accounts at Gibraltar Bank and TD Bank.  The court entered the order the next day.[9]  The Trustee promptly moved the District Court to lift the restraining order to the extent that it applied to these bank accounts on the ground that the bank accounts, and the funds they held, were part of the RRA bankruptcy estate.[10]  The court denied his motion.

On January 27, 2010, Rothstein, pursuant to a plea agreement, pled guilty to all charges and forfeited to the United States "all of his right, title and interest to all assets listed in the Information."  Record, vol. 2, no. 69, at 3.  On April 19, 2010, the District Court issued a preliminary order of forfeiture, in which Rothstein forfeited to the United States "[a]ll right, title and interest . . . in the property set

---

property being destroyed, removed from the jurisdiction of the court, or otherwise made unavailable for forfeiture; and
(ii) the need to preserve the availability of the property through the entry of the requested order outweighs the hardship on any party against whom the order is to be entered.

[8] 21 U.S.C. § 853(e)(1)(A) is virtually identical to the 18 U.S.C. § 1963 provision set out in note 7, supra, and is made a part by reference of the criminal forfeiture provisions of 18 U.S.C. § 982.  See 18 U.S.C. § 982(b)(1).

[9] The order restrained the "defendant, his agents, servants, employees, attorneys, family members and those persons in active concert or participation with him, and those persons, financial institutions, or other entities who have any interest or control over the subject property listed in [the information]."  Protective Order, Record, vol. 1, no. 13, at 2.

[10] The Bankruptcy Code provides that a bankruptcy estate, and therefore the Trustee, takes "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).

forth in [the information]." Record, vol. 3, no. 134, at 3.[11] Pursuant to

§§ 853(n)(1) and 1963(l)(1), notice of forfeiture was published on May 5, 2010.

On June 9, 2010, the court sentenced Rothstein to concurrent prison terms of fifty

years and, as part of his sentence, ordered that his "right, title and interest to the

property identified in the preliminary order of forfeiture" be forfeited to the United

States. Record, vol. 8, no. 290, at 6. Immediately after Rothstein was sentenced,

the Government attempted to seize the funds RRA held in some of the listed bank

accounts. TD Bank rejected the attempt—because of the dispute between the

Government and the Trustee—and appeared before the court on June 11 seeking

guidance. Following a hearing at which the Trustee was represented, the court

ordered the bank to turn over to the Government the bank accounts described in the

preliminary order of forfeiture and held by RRA.

---

[11] Neither the information nor the preliminary order of forfeiture identifies the statute pursuant to which the listed properties were forfeited. Moreover, neither identifies the applicable forfeiture provision—that is, whether a listed property was "involved in" Rothstein's Ponzi scheme, constituted "proceeds" of that scheme, or was "derived from" such proceeds. Accordingly, we must guess the answers.

Given the way in which the Government responded to the Trustee's motion to lift the restraining order as applied to RRA's accounts at Gibraltar Bank and TD Bank, we assume that the Government sought forfeiture of the funds in those accounts under the theory that the funds constituted proceeds of Rothstein's Ponzi scheme.

B.

Before sentencing, on May 24, 2010, the Trustee petitioned the District

Court pursuant to the ancillary hearing procedure provided by 21 U.S.C. § 853(n)[12]

---

[12] Titled "Third party interests," 21 U.S.C. § 853(n) states, in pertinent part:
(1)  Following the entry of an order of forfeiture under this section, the United
States shall publish notice of the order and of its intent to dispose of the property
in such manner as the Attorney General may direct.  The Government may also,
to the extent practicable, provide direct written notice to any person known to
have alleged an interest in the property that is the subject of the order of forfeiture
as a substitute for published notice as to those persons so notified.
(2)  Any person, other than the defendant, asserting a legal interest in property
which has been ordered forfeited to the United States pursuant to this section may,
within thirty days of the final publication of notice or his receipt of notice under
paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate
the validity of his alleged interest in the property.  The hearing shall be held
before the court alone, without a jury.
. . .
(5)  At the hearing, the petitioner may testify and present evidence and witnesses
on his own behalf, and cross-examine witnesses who appear at the hearing.  The
United States may present evidence and witnesses in rebuttal and in defense of its
claim to the property and cross-examine witnesses who appear at the hearing.  In
addition to testimony and evidence presented at the hearing, the court shall
consider the relevant portions of the record of the criminal case which resulted in
the order of forfeiture.
(6)  If, after the hearing, the court determines that the petitioner has established by
a preponderance of the evidence that—
    (A) the petitioner has a legal right, title, or interest in the property, and such
    right, title, or interest renders the order of forfeiture invalid in whole or in part
    because the right, title, or interest was vested in the petitioner rather than the
    defendant or was superior to any right, title, or interest of the defendant at the
    time of the commission of the acts which gave rise to the forfeiture of the
    property under this section; or
    (B) the petitioner is a bona fide purchaser for value of the right, title, or
    interest in the property and was at the time of purchase reasonably without
    cause to believe that the property was subject to forfeiture under this section;
the court shall amend the order of forfeiture in accordance with its determination.
(7) Following the court's disposition of all petitions filed under this subsection, or
if no such petitions are filed following the expiration of the period provided in
paragraph (2) for the filing of such petitions, the United States shall have clear

to order the Government to return the RRA accounts held in Gibraltar Bank and TD Bank. His petition pointed out that, as the information stated, the TD Bank accounts were held in the name of RRA and that he could establish that the Gibraltar Bank accounts were likewise held in the name of RRA. As for the other properties listed in the preliminary order of forfeiture,[13] he requested that the court declare that the bankruptcy estate held an interest in such properties—because they were acquired with funds from RRA's bank accounts—that was "vested in the [law firm] rather than [Rothstein or the Government]." See § 853(n).

On June 11, 2010, the Government moved to dismiss the Trustee's petition,[14] arguing, in effect, that the preliminary order of forfeiture forfeited to the United States the funds RRA held in the bank accounts. On July 9, 2010, the court denied its motion with respect to the bank accounts. It granted the motion, however, as it related to the other properties listed in the information, agreeing with the Government that (1) because the United States "unequivocally represented

---

title to property that is the subject of the order of forfeiture and may warrant good title to any subsequent purchaser or transferee.

[13] These properties were both tangible and intangible and included vehicles, real property, jewelry, high-value gift cards, business interests, contribution interests, life insurance premiums paid, credit card reward points, and $2,328,000 from a Swiss bank account in the name of Jewel Cruises Holding AG.

[14] The Government's motion cited several grounds for the dismissal of the Trustee's petition. One of the grounds was that the Trustee lacked standing to petition the court for the relief he sought. The District Court, holding that under the Bankruptcy Code the Trustee and RRA were one and the same, rejected the Government's standing argument.

10

that [it would] use all forfeited property, less administrative costs, to reimburse qualified victims through restitution . . . the restitution process provides the Trustee with an adequate remedy at law"; and (2) "[i]t would be patently unequitable to return money to RRA's estate when it can be returned directly to the clients and qualified investors."  Record, vol. 10, no. 400, at 22.

On August 12, the Trustee moved the District Court for summary judgment as to the RRA accounts with Gibraltar Bank and TD Bank on the ground that it was undisputed that the accounts were RRA accounts.[15]  While the motion was pending, the court held a § 853(n) ancillary hearing regarding the Trustee's claim to the bank accounts.[16]  At the conclusion of the hearing, on August 25, the court denied the Trustee's motion, but ordered some portion of six of the bank accounts returned to the Trustee after finding that the funds on deposit did not constitute proceeds of Rothstein's criminal conduct.[17]  The Government then moved the court to reconsider its ruling as to three of the bank accounts.  On October 14, the court

---

[15]  The motion relied on the pleadings—the information and the terms of the preliminary forfeiture order—rather than affidavits.  The motion was therefore a motion for judgment on the pleadings.  Nonetheless, we refer to it as a motion for summary judgment.

[16]  Other third party claims not relevant here, including that of the intervenor in this appeal, were also adjudicated at this hearing.

[17]  The court found that three accounts "contain[ed] criminal proceeds and/or funds derived from criminal conduct and [that] no petitioner has proved by a preponderance of evidence a superior right to that of Mr. Rothstein at the time of the commission of the acts which gave rise to the forfeiture" to those accounts.  Record, vol. 13, no. 579, at 3.  Additionally, it found that the "Trustee ha[d] failed to prove that the contents of [one account] were derived from legitimate sources."  Id. at 9.

11

entered an order granting the motion with respect to two of the accounts on the ground that the funds in those accounts more likely than not were "proceeds of fraud."  Record, vol. 14, no. 637, at 6.  The funds in those two accounts thus remain in the Government's custody subject to further order of the court.

The Trustee now appeals the District Court's denial of his petition.  He challenges, specifically, the court's orders of July 9, August 25, and October 14, 2010, arguing that the bank accounts and the properties listed in the information that were purchased with funds from those accounts constitute assets of the bankruptcy estate.  We address first the Trustee's claims with respect to the RRA bank accounts and, second, his claims with respect to the remaining properties—tangible and intangible personal property and real estate.  We review the district court's factual findings for clear error and its legal conclusions de novo.  United States v. Shefton, 548 F.3d 1360, 1363 (11th Cir. 2008).

## II.

The Trustee contends, in essence, that the bank accounts could not be forfeited because the funds they held did not constitute proceeds of Rothstein's Ponzi scheme.  Further, in his responsive briefing to our questions at oral argument, he contends that the RRA bank accounts contained commingled assets and thus were not subject to proceeds forfeiture.

12

A.

While the plea agreement and preliminary order of forfeiture both equivocate on the point, it seems to us from the surrounding documents that, in seeking the forfeiture of the law firm's bank accounts, the Government proceeded under the theory that the accounts comprised the proceeds of Rothstein's Ponzi scheme.  We have said that proceeds of crime constitute a defendant's "interest" in property, United States v. Conner, 752 F.2d 566, 575–76 (11th Cir. 1985); for this reason, they can be forfeited in an in personam proceeding in a criminal case.

Though RICO does not define "proceeds," see 18 U.S.C. § 1961, the only other statutory provision that the Government has cited that makes reference to proceeds forfeiture, 18 U.S.C. § 981(a)(1)(C), defines it as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and . . . not limited to the net gain or profit realized from the offense," 18 U.S.C. § 981(a)(2)(A).  Therefore, whatever money Rothstein obtained as a result of his criminal activity, and any property that can be traced to that money, is forfeitable.  Under the relation-back rule, where such money or property is "subsequently transferred to a person other than the defendant," that money or property "vests in the United States upon the commission of the act giving rise to forfeiture" unless the third party can demonstrate his right to the property in an § 853(n) hearing.  21 U.S.C. § 853(c).

B.

Property can only be forfeited as proceeds, however, where the Government "establishe[s] the requisite nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1)(A). The Advisory Committee notes to Federal Rule of Criminal Procedure 32.2 offer the money on deposit in a bank account as one example of "specific property" that requires such a showing:

> To the extent that the government is seeking forfeiture of a particular asset, such as the money on deposit in a particular bank account that is alleged to be the proceeds of a criminal offense, or a parcel of land that is traceable to that offense, the court must find that the government has established the requisite nexus between the property and the offense.

Fed. R. Crim. P. 32.2(b) advisory committee's note, 2000 adoption. Where no such showing can be made, the Government must resort to the substitute asset provision of sections 1963 and 853, which provides that "the court shall order the forfeiture of any other property of the defendant" where "as a result of any act or omission of the defendant," forfeitable property, such as proceeds, "has been commingled with other property which cannot be divided without difficulty." 21 U.S.C. § 853(p). [18] The Government may seek forfeiture under this provision of property "up to the value of" commingled property. Id.

---

[18] Section 1963(m) of Title 18 is substantively identical to 21 U.S.C. § 853(p).

We have not previously addressed the question of when property becomes so commingled that it may not be forfeited directly such that substitute property must be forfeited instead.[19] The Third Circuit, however, has offered instructive guidance in a pair of cases, United States v. Voigt, 89 F.3d 1050 (3d Cir. 1996), and United States v. Stewart, 185 F.3d 112 (3d Cir. 1999). In Voigt, that court held that "the government must prove by a preponderance of the evidence that the property it seeks under § 982(a)(1) in satisfaction of the amount of criminal forfeiture to which it is entitled has some nexus to the property 'involved in' the money laundering offense." Id. at 1087. Commenting that this burden may be very difficult to meet where property "is commingled in an account with untainted

---

[19] Before the amendment of the forfeiture statutes to provide for forfeiture of substitute property, we found in United States v. Conner, 752 F.2d 566, 576 (11th Cir. 1985), that, where a jury returned a special verdict for a particular sum of money—essentially a money judgment—against a defendant, the government was not required to trace the proceeds to identifiable assets belonging to the defendants. We found:

> [s]ince [criminal] forfeiture is in personam, [such a forfeiture] follows the defendant as a part of the penalty and thus it does not require that the government trace it, even though the forfeiture is not due until after conviction. Money is a fungible item. It matters not that the government received the identical money which the defendants received as long as the amount that was received in violation of the racketeering statute is known.

In fashioning a judicial rule that allowed the District Court, where the Government could not trace forfeitable proceeds, to issue a money judgment in the amount "received in violation of the racketeering statute" that the Government could satisfy by levying on the defendant's assets, Conner effectively foreshadowed the substitute asset provision that Congress would enact in its amendment of RICO a year later. See Pub. L. No. 99-570, tit. I, Sec. 1153(a), 100 Stat. 3207, 3207-13 (adding the present subsection (m) to the RICO forfeiture statute). The specific finding in that case, however, that the Government need not trace proceeds to the defendant's assets, cannot apply in this case because the bank accounts, held by RRA, cannot be presumed to be Rothstein's property.

15

property," the court rejected the government's effort to forfeit items of jewelry "purchased with funds from an account into which money laundering proceeds had been commingled with other funds, and after numerous intervening deposits and withdrawals." Id. at 1087–88. The court held that, in such a situation, funds cannot be traced as a matter of law, and therefore "the government must satisfy its forfeiture judgment through the substitute asset provision." Id. at 1088 (emphasis added).

Three years later, in Stewart, the Third Circuit was confronted with the question of "whether the government may forfeit directly tainted funds from an account that has been frozen from the time of the illegal transfer but that also contains untainted money." Stewart, 185 F.3d at 129. Observing that Stewart involved one $3 million transfer into a single account that previously contained only $160,000 and that, before that account was frozen "almost immediately" after the transfer, only one withdrawal was made, with the government's permission, to pay the defendant's trial attorney, the Third Circuit found the case to be distinguishable from Voigt. Id. In Stewart, "the government clearly traced laundered funds forfeited by the jury to Stewart's Account. Stewart does not contest this tracing, which in any event the government clearly established." The court found that the "difficulty" alluded to by the substitute asset provision, and in turn in Voigt, was not present in Stewart. The court thus carved out an exception

16

to its earlier holding in <u>Voigt</u>: in a very simple case involving few individual deposits, traced proceeds within a commingled account may be directly forfeited without resort to the substitute asset provision, without "render[ing] the substitute asset provision a nullity." <u>Voigt</u>, 89 F.3d at 1087.

In the case at hand, Rothstein's investors' funds were deposited in RRA bank accounts and commingled with legitimate income RRA received from the billings of its seventy lawyers, $12 million in the first ten months of 2009 alone. This commingling went on for four years—the duration of Rothstein's Ponzi scheme. The sheer volume of financial information available and required to separate tainted from untainted monies in this case leads us to the conclusion that it is far more appropriate to apply the Third Circuit's rule in <u>Voigt</u> than the exception to that rule it lays out in <u>Stewart</u>.

Quite unlike the situation in the latter case, here, the Government revealingly presented as an exhibit to the brief it filed in support of its motion for a preliminary order of forfeiture an FBI agent's affidavit that included twenty-one pages detailing transfers in and out of the RRA bank accounts made on behalf of Rothstein's investors, RRA, and "other" depositors. Even these, the agent noted, did not comprise "each and every fact known to me" but instead a one-page "summary of all deposits, transfers and withdrawals for the subject accounts" during a one-month period and "twenty pages regarding my review of the subject

17

accounts and other accounts for the purpose of attempting to identify non-investor clients of RRA." Record, vol. 2, no. 133-1, 1–3. The District Court itself expressed frustration with the tracing methodology the parties employed at the ancillary hearing, which focused on the timing of deposits and withdrawals. The methodology, borrowed from the law of trusts and referred to as the lowest intermediate balance rule ("LIBR"), attempts to divide tainted and untainted money by considering, where a set amount of proceeds is deposited into an account and commingled with other funds, "the account to be 'traceable proceeds' to the extent of [the deposited proceeds] as long as the account balance never falls below that sum." United States v. Banco Cafetero Panama, 797 F.2d 1154, 1159 (2d Cir. 1986). The court dubbed the LIBR a "legal fiction," Record, vol. 13, no. 579, at 12, but acknowledged that, according to the Government's representation in open court, "all of the interested parties believe LIBR provides the appropriate legal rule here," id. at 13 n.8. The Court therefore "honor[ed] the parties' accord." Id. at 13 n.8.

In sum, if ever there was a case where commingled proceeds "c[ould not] be divided without difficulty" and that therefore required the Government to seek forfeiture pursuant to the statutes' substitute property provisions, §§ 1963(m) and 853(p), this is that case. For us to conclude otherwise would "render the substitute asset provision a nullity," Voigt, 89 F.3d at 1087, contrary to the time-honored

18

canon of construction that we "'should disfavor interpretations of statutes that render language superfluous,'" In re Griffith, 206 F.3d 1389, 1393 (11th Cir. 2000) (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253, 112 S. Ct. 1146, 1149, 117 L. Ed. 2d 391 (1992)).  We therefore hold that the District Court erred in ordering forfeiture of the funds as proceeds.  Consequently, all proceedings the court held subsequent to the imposition of Rothstein's sentence must be vacated.

C.

Our conclusion that the bank accounts did not contain forfeitable proceeds does not foreclose the Government's attempt to forfeit a property interest held by Rothstein, individually; that is, a property interest that is neither proceeds of his criminal activity nor derived therefrom.  An example of such interest is Rothstein's shareholder's interest in RRA and hence in the firm's bank accounts.  The Government, as the court in Voigt made clear, may on remand move the District Court "to amend the judgment to reflect that [Rothstein's interest in the law firm and thus its bank accounts] is forfeitable as a substitute asset," Voigt, 89 F.3d at 1088.

The District Court must be mindful that a substitute property interest may be forfeited only "up to the value of" any forfeitable proceeds that have been commingled and are accordingly unavailable for forfeiture as proceeds.  18 U.S.C. § 1963(m); 21 U.S.C. § 853(p)(2).  The Government must identify and establish

19

the value of the proceeds that were commingled. Since a substitute property interest is not within the District Court's jurisdiction as it would be were the court proceeding in rem, the District Court, to effectuate forfeiture of the property interest, exercises its in personam jurisdiction over the defendant and orders the defendant to convey the interest to the United States. So, if the court orders Rothstein's shareholder interest in RRA forfeited as a substitute property interest, it will order Rothstein to assign the interest—which encompassed the accounts—to the Government subject, of course, to any claims third parties may have against such interest. Then, with that assignment in hand, the Government, standing in Rothstein's shoes, may appear in the Chapter 11 proceeding and lay claim to Rothstein's share of law firm assets that survive bankruptcy.

## III.

The Trustee claims that the District Court erred in forfeiting to the United States other properties listed in the information and the preliminary order of forfeiture because such properties were neither proceeds nor properties derived from proceeds. The Trustee bases his claim on the fact that these other properties were purchased with funds contained in the RRA bank accounts. The District Court refused to consider the Trustee's claim, accepting the Government's position that considerations of equity precluded the claim. The court erred. If the funds used to acquire the other properties came from one or more RRA bank accounts,

20

the Trustee prevails as a matter of law since the funds consisted of proceeds commingled with legitimate RRA funds and, as such, were not forfeitable as proceeds. And because the funds were not proceeds, it follows that any properties purchased with them were not properties derived from proceeds.

Whether RRA bank account funds were used to acquire the other properties at issue is a question of fact. We accordingly vacate the District Court's decision dismissing the Trustee's claims to such properties and remand the case so that the District Court may resolve the fact issue. In doing so, the court must bear in mind the fact that Rothstein's forfeiture of "all of his right, title and interest to all assets listed in the Information," Record, vol. 2, no. 69, at 3, coupled with the Government's representation in the plea agreement that it could prove by a preponderance of the evidence that Rothstein's interest was forfeitable, id. at 14–15, established a mere presumption that the properties so listed constituted forfeitable proceeds or properties derived from such proceeds.[20] If the Trustee

---

[20] The Government represented in the plea agreement that
[h]ad the forfeiture portion of the case proceeded to trial, the government would have established, at least by a preponderance of the evidence, the standard of proof required for sentencing, that the properties listed for forfeiture in the forfeiture allegations of the Information and in the Bill of Particulars for Forfeiture, were properly sought for forfeiture because the defendant acquired or maintained an interest therein or were derived from proceeds obtained directly and indirectly through the commission of the above-described racketeering activity. The government would have further established that the properties were involved in and/or were traceable to the money laundering activity described

21

introduces credible evidence that the properties were acquired with funds from RRA's bank accounts, that presumption will vanish and, in order to establish its right to forfeiture, the Government will have to produce credible evidence that the properties were acquired with proceeds of Rothstein's criminal activity. [21]

The judgment of the District Court is

VACATED and REMANDED

---

above, and that such properties were also the proceeds of, or were derived from, the mail and wire fraud activity described above.

Record, vol. 2, no. 69, at 14–15.

[21]  As the Third Circuit wrote in Voigt:

Even under the preponderance standard, the items of jewelry cannot be considered "traceable to" the proceeds of money laundering activity; the jewelry was purchased with funds from an account into which money laundering proceeds had been commingled with other funds, and after numerous intervening deposits and withdrawals.  We therefore cannot say that, more probably than not, the jewelry is "traceable to" money laundering activity.

United States v. Voigt, 89 F.3d 1050, 1088 (3d Cir. 1996).

22

## APPENDIX

**ATTACHMENT A TO PRELIMINARY ORDER OF FORFEITURE**

**A.      Real Properties ("RP"):**

(RP1)  2307 Castilla Isle, Fort Lauderdale, Florida, hereafter also referred to as "Defendant RPl," includes all buildings, improvements, fixtures, attachments and easements found therein or thereon, and is more particularly described as Lauderdale Shores Reamen Plat 15-31 B Lot 2 Blk 5 with a Folio Number of 5042 12 13 0210;

(RP2)  2308 Castilla Isle, Fort Lauderdale, Florida, hereafter also referred to as "Defendant RP2," includes all buildings, improvements, fixtures, attachments and easements found therein or thereon, and is more particularly described as: Lauderdale Shores Reamen Plat 15-31 B Lot 2 Blk 4 with a Folio Number of 5042 12 13 0020;

(RP3)  2316 Castilla Isle, Fort Lauderdale, Florida, hereafter also referred to as "Defendant RP3," includes all buildings, improvements, fixtures, attachments and easements found therein or thereon, and is more particularly described as: Lauderdale Shores Reamen Plat 15-31 B Lot 3 & Lot 4 W ½ Blk 4 with a Folio Number of 5042 12 13 0030;

(RP4)  30 Isla Bahia Drive, Fort Lauderdale, Florida, hereafter also referred to as "Defendant RP4," includes all buildings, improvements, fixtures, attachments and easements found therein or thereon, and is more particularly described as: Isla Bahia 47-27 B Lot 63 with a Folio Number of 5042 13 16 0640;

(RP5)  29 Isla Bahia Drive, Fort Lauderdale, Florida, hereafter also referred to as

23

"Defendant RP5," includes all buildings, improvements, fixtures, attachments and easements found therein or thereon, and is more particularly described as: Isla Bahia 47-27 B Lot 35 with a Folio Number of 5042 13 16 0360;

(RP6)  350 SE 2nd Street, Unit 2840, Fort Lauderdale, Florida, hereafter also referred to as "Defendant RP6," includes that portion of the condominium, improvements, fixtures, attachments and easements found therein or thereon, and is more particularly described as: 350 Las Olas Place Condo Unit 2840 with a Folio Number of 5042 10 AN 1490;

(RP7)  380 Carrington Drive, Weston, Florida, hereafter also referred to as "Defendant RP7," includes all buildings, improvements, fixtures, attachments and easements found therein or thereon, and is more particularly described as: Sector 4 North 153-46 B Lot 24 Blk A with a Folio Number of 5039 01 02 0240;

(RP8)  2133 Imperial Point Drive, Fort Lauderdale, Florida, hereafter also referred to as "Defendant RP8," includes all buildings, improvements, fixtures, attachments and easements found therein or thereon, and is more particularly described as: Imperial Point 1 Sec 53-44 B Lot 11 Blk 22 with a Folio Number of 4942 12 07 2020;

(RP9)  2627 Castilla Isle, Fort Lauderdale, Florida, hereafter also referred to as "Defendant RP9," includes all buildings, improvements, fixtures, attachments and easements found therein or thereon, and is more particularly described as: Lauderdale Shores Reamem Plat 15-31 B Lot 22 Blk 5 with a Folio Number of 5042 12 13 0380;

(RP 10) 10630 NW 14th Street, Apt. 110, Plantation, Florida, hereafter also referred to as

24

"Defendant RP10," includes that portion of the condominium/townhome, improvements, fixtures, attachments and easements found therein or thereon, and is more particularly described as: OPTIMA VILLAGE 1-"C" CONDO UNIT 201 BLDG 2 with a Folio Number of 4941 31 AC 0110;

(RP11) 227 Garden Court, Lauderdale by the Sea, Florida, hereafter also referred to as "Defendant RP11," includes that portion of the buildings, improvements, fixtures, attachments and easements found therein or thereon, and is more particularly described as: SILVER SHORES UNIT A 28-39 B POR of Lot 4, BLK 5 DESC AS TO BEG AT SE COR SAID LOT 4, N 79.37 W 37.75, S 79.37, E 35.75 TO POB AKA: UNIT E MARINA VILLAGE TOWNHOMES 227GARDEN with a Folio Number of 4943 18 24 0050;

(RP12) 708 Spangler Boulevard, Bay 1, Hollywood, Florida, hereafter also referred to as "Defendant RP12," includes all buildings, improvements, fixtures, attachments and easements found therein or thereon, and is more particularly described as: HARBOR VIEW 10-5 B PORTION OF LOTS 1 & 2 BLK 2 DESC AS COMM 25 S OF NE COR OF LOT 2 ON E/L, W 20.52 ALG S/R/W/L OF ST RD 84, S 15.72 TO POB, S 7.25, E 12.59, S 24.40, W 29.92, N 7.66, W 31.74, N 24.00, E 49.07 TO POB AKA: BAY I PORTSIDE with a Folio Number of 5042 23 28 0010;

(RP13) 1012 East Broward Boulevard, Fort Lauderdale, Florida, hereafter also referred to as "Defendant RP13," includes all buildings, improvements, fixtures, attachments and easements found therein or thereon, and is more particularly described as: BEVERLY HEIGHTS 1-30 B LOT 1 W 100, LOT 2 W 100 BLK I7 with a Folio

25

Number of 5042 I1 07 0540;

(RP14) 950 N Federal Highway, Pompano Beach, Florida, hereafter also referred to as "Defendant RP14," includes all buildings, improvements, fixtures, attachments and easements found therein or thereon, and is more particularly described as: 31-48-43 S 150 OD FOL DESC, BEG INTER E R/W/L ST RD 5, N TO POB with a Folio Number of 4843 31 00 0401;

(RP 15) 350 SE 2nd Street, Commercial Unit 2, Fort Lauderdale, Florida, hereafter also referred to as "Defendant RP15," includes all portion of that condominium, improvements, fixtures, attachments and easements found therein or thereon, and is more particularly described as: 350 LAS OLAS PLACE COMM CONDO UNIT CU2 with a Folio Number of 5042 10 AP 0020;

(RP 16) 361 SE 9 Lane, Boca Raton, Florida hereafter also referred to as "Defendant RP16," includes all buildings, improvements, fixtures, attachments and easements found therein or thereon more particularly described as Lot 5, Mizner Lake Estates, P.U.D.;

(RP17) 1198 N Old Dixie Highway, Boca Raton, Florida hereafter also referred to as "Defendant RP17," includes all buildings, improvements, fixtures, attachments and easements found therein or thereon;

(RP18) 1299 N Federal Highway, Boca Raton, Florida hereafter also referred to as "Defendant RP18," includes all buildings, improvements, fixtures. attachments and easements found therein or thereon;

(RP19) 151 East 58 Street, Apartment 42D, New York, New York hereafter also referred to as "Defendant RP19," includes all portion of that condominium, improvements,

26

fixtures, attachments and easements found therein or thereon;

(RP20)  11 Bluff Hill Cove Farm, Narragansett, Rhode Island hereafter also referred to as "Defendant RP20," includes all buildings, improvements, fixtures, attachments and easements found therein or thereon;

(RP21)  15 Bluff Hill Cove Farm, Narragansett, Rhode Island hereafter also referred to as "Defendant RP21," includes all buildings, improvements, fixtures, attachments and easements found therein or thereon;

(RP22) 353 4 Ave., Unit 12-H, Brooklyn, NY hereafter also referred to as "Defendant RP22," includes all portion of that condominium, improvements, fixtures, attachments and easements found therein or thereon;

(RP23) 290W 11th St #1C, NY, NY hereafter also referred to as "Defendant RP23," includes all portion of that condominium, improvements, fixtures, attachments and easements found therein or thereon; and

(RP24) Versace Mansion/Casa Casuarina-10% Ownership hereafter also referred to as "Defendant RP24," includes all buildings, improvements, fixtures, attachments and easements found therein or thereon more particularly described as 1116 Ocean Drive, Miami Beach, FL Folio Number 02-3234-008-0310;

**B.    Vehicles and Vessels ("VV"):**

(VVI)  1990 Red Ferrari F40 Coupe, VIN: ZFFMN34A5L0087066;

(VV2)  2009 White Bentley Convertible, VIN: SCBDR33W29C059672;

(VV3)  2008 Yellow McLaren Mercedes Benz SLR, VIN: WDDAK76F98M001788;

(VV4)  2007 Black Limousine Ford Expedition, VIN: 1F1FK15557LA59223;

(VV5)  2008 Red Ferrari 430 Spider, VIN: ZFFEW59A380163011;

(VV6)  2007 Silver Rolls Royce Convertible, VIN: SCA1L68557UX23044;

(VV7)  2006 Silver Hummer H1, VIN: 137PH84396E220665;

(VV8)  2008 Cadillac Escalade, VIN: 1GYEC63858R234458;

(VV9)  1967 Red Convertible Corvette, VIN: 194677S104745;

(VV10) 2008 Black Bugatti Veyron EB 16.4, VIN: VF9SA25C28M795153;

(VV11) 2008 Blue Rolls Royce Drophead Convertible, VIN: SCA2D68528UX16071;

(VV12) 2006 Red Ferrari F430 Spider, VIN: ZFFEW59A560148863;

(VV13) 2008 Chevrolet Corvette, VIN: 1G1YY26W485120085;

(VV14) 2009 Chevrolet Corvette Z06, VIN: 1G1YZ26E995111923;

(VV15) 2009 Blue Gray Maserati Granturismo Coupe, VIN: ZAMGJ45A090042326;

(VV16) 2009 White Mercedes Benz, VIN WDBSK71F59F149477;

(VV17) 2007 87' Warren, Hull # WAR87777B707;

(VV18) 33' Aquariva, Hull # XFA33R74G405;

(VV19) 2009 11' Yamaha Jet Ski, Hull # YAMA3661I809;

(VV20) 2009 11' Yamaha VS, Hull # YAMA3626I809;

(VV21) 2009 11' Yamaha VS, Hull #YAMA2679G809;

(VV22) I999 55' Sea Ray 540 Sundancer, SERY0500I899;

(VV23) 2009 Yamaha Jet Ski, Hull # YAMA4288K809;

(VV 24) 2010 White Lamborghini lp-670sv, VIN: ZHWBU8AHXALA03837;

(VV25) Mercedes Benz S65 VR Byturbo, VIN: WDDEJ79XX8A015189;

(VV26) 2009 RED BMW CONVERTIBLE, VIN: WBALM53529El60836;

(VV27)2009 MERCEDES BENZ SLK 350 CONVRTBL VIN:WDBWK58Fl9Fl90779;

28

C.      **Tangibles ("T")**

(T1)    Approximately 304 pieces of jewelry, watches, necklaces and earrings seized on or about Monday, November 9, 2009 from the residence of Scott and Kimberly Rothstein;

(T2)    16 DuPont Lighters seized on or about Monday, November 9, 2009 from the residence of Scott and Kimberly Rothstein;

(T3)    3 pieces sports memorabilia seized on or about Monday, November 9, 2009 from the residence of Scott and Kimberly Rothstein;

(T4)    $271,160 in United States currency seized on or about Monday, November 9, 2009 from the residence of Scott and Kimberly Rothstein;

(T5)    $1,500 in United States currency, seized on about Wednesday, November 4, 2009, from the office of Scott W. Rothstein at the law firm of Rothstein, Rosenfeldt and Adler, P.A.;

(T6)    $30,000 in American Express Gift Cards to the attention of Scott Rothstein, obtained from UPS on or about November 12, 2009;

(T7)    $50,000 in American Express Gift Cards to the attention of Scott Rothstein, obtained from UPS on or about November 13, 2009;

(T8)    5 additional watches being turned over to the United States by Les Stracher; and

(T9)    Guitar collection of Scott W. Rothstein, located at the residence of Scott and Kimberley Rothstein, valued between $10,000 and $20,000.

D.      **Bank Accounts ("BA")**

(BA1)   Fidelity Investments Stock Account, in the name of Scott W. Rothstein, valued at approximately $1,263,780, in the actual amount of$1,270,302.32;

29

(BA2) Gibraltar Bank account 50010085, in the approximate amount of $484,900.68;

(BA3) Gibraltar Bank account 50010093, in the approximate amount of $53,448.51;

(BA4) Gibraltar Bank account 50011253, in the approximate amount of $71,793.06;

(BAS) Gibraltar Bank account 50015214, in the approximate amount of $995,521.42;

(BA6) Bank account 178780211819923220000187 at Banque Populaire, Morocco, in the name of Scott Rothstein, in the approximate amount of $12,000,000 up to the amount of $16,000,000;

(BA 7) Bank account at Banque Populaire, Morocco, in the name of Ahnick Khalid, up to the amount of $2,000,000;

(BAS) Bank account at Banque Populaire, Morocco, in the name of Steve Caputi, up to the amount of $1,000,000;

(BA9) Toronto Dominion Bank, N.A. account 6860291266 in the name of Rothstein Rosenfeldt Adler, P.A. which, on or about November 11, 2009, contained the approximate amount of $54,021.27;

(BA10) Toronto Dominion Bank, N.A. account 6861011556 in the name of Rothstein Rosenfeldt Adler, P.A. which, on or about November 11, 2009, contained the approximate amount of $10,085.00;

(BA11) Toronto Dominion Bank, N.A. account 6860420923 in the name of Rothstein Rosenfeldt Adler, P.A, Attorney Trust Account 3, which, on or about November 11, 2009, contained the approximate amount of $720,892.08;

(BA12) Toronto Dominion Bank, N.A. account 6860422200 in the name of DJB Financial Holding, which, on or about November 11, 2009, contained the approximate amount of $64,970.00;

30

(BA13) Toronto Dominion Bank, N.A. account 6860755757 the name of RRA Sports and Entertainment LLC, which, on or about November 11, 2009, contained the approximate amount of $10,490.10;

(BA14) Toronto Dominion Bank, N.A. account 6860755781 in the name of RRA Goal Line Management, LLC, which, on or about November 11, 2009, contained the approximate amount of $25,216.27;

(BA15) Toronto Dominion Bank, N.A. account 6861077714 in the name of Rothstein Rosenfeldt Adler, P.A., which, on or about November 11, 2009, contained the approximate amount of $20,080.00;

(BA16) Toronto Dominion Bank, N.A. account 6861076906 in the name of Rothstein Rosenfeldt Adler PA, Attorney Trust Account, which, on or about November 13, 2009, contained the approximate amount of $23,406.16;

(BA17) Toronto Dominion Bank, N.A. account 6861011614 in the name of Rothstein Rosenfeldt Adler PA, which, on or about November 13, 2009, contained the approximate amount of $14,657.80;

(BA 18) Toronto Dominion Bank, N.A. account 6860291274 in the name of Rothstein Rosenfeldt Adler PA, Operating Account, which, on or about November 13, 2009, contained the approximate amount of $28,743.43;

(BA19) Toronto Dominion Bank, N.A. account 6861076922 in the name of Rothstein Rosenfeldt Adler PA, BIF Account, which, on or about November 13, 2009, contained the approximate amount of $52,749.68;

(BA20) Schwyzer Kantonalbank, account #CH75 0077700530742040 in the name of Jewel Cruises Holding AG, Wollerau, Switzerland;

31

E.    **Business Interests ("BI")**

(BI1)    Stock certificates, if issued, or the beneficial interest in such shares, of 50,000

shares of capital stock, in Gibraltar Private Bank & Trust, a federally chartered

stock savings association, purchased in or about September 2009 by GBPT, LLC,

a Delaware Limited Liability Company, by its manager, Bahia Property

Management, LLC, a Delaware Limited Liability Company, by its co-manager,

Scott W. Rothstein;

(BI2)    Scott W. Rothstein's equity interest in QTask;

(BI3)    Scott W. Rothstein's equity interest in Broward Bank of Commerce;

(BI4)    Scott W. Rothstein's equity interest in Bova Ristorante;

(BI5)    Scott W. Rothstein's equity interest in Bova Cucina;

(BI6)    Scott W. Rothstein's equity interest in Bova Prime;

(BI7)    Scott W. Rothstein's equity interest in Café Iguana, Pembroke Pines, Florida;

(BJ8)    Scott W. Rothstein's equity interest in Cart Shield USA, LLC;

(BI9)    Scott W. Rothstein's equity interest in Renato Watches;

(BI10)    Scott W. Rothstein's equity interest in Edify LLC;

(BI11)    Scott W. Rothstein's equity interest in V Georgio Vodka;

(BI12)    Scott W. Rothstein's equity interest in Sea Club Ocean Resort Hotel, LLC;

(BI13)    Scott W. Rothstein's equity interest in North Star Mortgage;

(BI14)    Scott W. Rothstein's equity interest in Kip Hunter Marketing;

(BI15)    Scott W. Rothstein's equity interest in RRA Sports and Entertainment, LLC;

(BI16)    Scott W. Rothstein's equity interest in Versace Mansion/Casa Casuarina,

including 10 year Operating Agreement with 2 ten year options;

32

(BI17) Scott W. Rothstein's equity interest, and licensing rights, in Alternative Biofuel Technologies, Inc.;

(BI18) Scott W. Rothstein's equity interest in RRA Goal Line Management;

(BI19) Scott W. Rothstein's equity interest in Iron Street Management, LLC;

(BI20) Scott W. Rothstein's equity interest in, and loan to, Africat Equity IG Decide;

(BI21) Scott W. Rothstein's equity interest in, and rents derived from 1198 Dixie LLC;

(BI22) Scott W. Rothstein's equity interest in, and rents derived from 1299 Federal LLC;

(BI23)  Promissory Note by Uniglobe in favor of Scott W. Rothstein; and

(BI24) All equity interest held by or on behalf of Scott W. Rothstein, in the following corporations and entities:

    a.     29 Bahia LLC;

    b.     235 GC LLC;

    c.     350 LOP#2840 LLC;

    d.     353 BR LLC;

    e.     10630 #110 LLC;

    f.     708 Spangler LLC;

    g.     1012 Broward LLC;

    h.     1198 Dixie LLC;

    i.     1299 Federal LLC;

    j.     2133 IP LLC;

    k.     15158 LLC;

    1.     AANG LLC;

    m.     AAMG1 LLC;

33

n.      AAMM Holdings;

o.      ABT Investments LLC;

p.      Advanced Solutions;

q.      Bahia Property Management LLC;

r.      Boat Management LLC;

s.      BOSM Holdings LLC;

t.      BOVA Prime LLC;

u.      BOVA Restaurant Group LLC;

v.      The BOVA Group LLC;

w.      BOVA Smoke LLC;

x.      BOVCU LLC;

y.      BOVRI LLC;

z.      Broward Financial Holdings, Inc.;

aa.     CI07 LLC;

ab.     CI08 LLC;

ac.     CI16 LLC;

ad.     CI27 LLC;

ae.     CSU LLC;

af.     D & D Management & Investment LLC;

a g.    D & S Management and Investment LLC;

ah.     DJB Financial Holdings LLC;

ai.     DYMMU LLC;

aj.     Full Circle Fort Lauderdale LLC;

ak.    Full Circle Trademark Holdings LLC;

al.    GHW1 LLC;

am.    IDNL GEAH LLC;

an.    ILK3 LLC;

ao.    IS Management LLC;

ap.    JRCL LLC;

aq.    Judah LLC;

ar.    Kendall Sports Bar;

as.    Kip Hunter Marketing LLC;

at.    NF Servicing LLC;

au.    NRI 11 LLC;

av.    NRI 15 LLC;

aw.    NS Holdings LLC;

ax.    PRCH LLC;

ay.    PK Adventures LLC;

az.    PK's Wild Ride Ltd;

ba.    Rothstein Family Foundation;

bb.    RRA Consulting Inc.;

be.    RRA Goal Line Management LLC;

bd.    RRA Sports and Entertainment LLC;

be.    RSA 11th Street LLC;

bf.    RW Collections LLC;

bg.    S & KEA LLC;

bh.    Scorh LLC;

bi.    Tipp LLC;

bj.    VGS LLC;

bk.    The Walter Family LLC;

bl.    Walter Industries LLC;

bm.    WPBRS LLC;

bn.    WAWW;

bo.    WAWW 2 LLC;

bp.    WAWW 3 LLC;

bq.    WAWW 4 LLC;

br.    WAWW 5 LLC;

bs.    WAWW 6 LLC;

bt.    WAWW 7 LLC;

bu.    WAWW 8 LLC;

bv.    WAWW 9 LLC;

bw.    WAWW 10 LLC;

bx.    WAWW 11 LLC;

by.    WAWW 12 LLC;

bz.    WAWW 14 LLC;

ca.    WAWW 15 LLC;

cb.    WAWW 16 LLC;

cc.    WAWW 17 LLC;

cd.    WAWW 18 LLC;

36

ce.    WAWW 19 LLC;

cf.    WAWW 20 LLC;

cg.    WAWW 21 LLC;

ch.    WAWW 22 LLC;

ci.    JB Boca M Holdings LLC;

(BI25) All interest held by or on behalf of Scott W. Rothstein, in the following

corporations and entities, and assets held by or owed , e.g., rents, to same:

(a)    The 2009 Scott W. Rothstein Revocable Trust;

(b)    REC Group, LLC;

(c)    REN Group, LLC;

(d)    REP Group, LLC;

(e)    RES Group, LLC;

(f)    RET Group, LLC;

(g)    REV Group, LLC;

(h)    AAMG, LLC;

(i)    BFHI, LLC;

U)    BFH1, LLC;

(k)    Cartshield USA, LLC;

(l)    CCCN, LLC;

(m)    CCM, LLC;

(n)    Cha Cha Cha, Inc.;

(o)    Fifth Court Financial, LLC;

{p)    GBPT, LLC;

37

(q)    Iron Street Management, LLC

(r)    JB Boca Holdings, LLC;

(s)    JJ Finance Holdings, LLC;

(t)    JWG Holdings, LLC;

(u)    Luxury Resorts, LLC;

(v)    MLC 350, LLC;

(w)    MRISC, LLC;

(x)    MRI Scan Center, Inc.;

(y)    QT, LLC

(z)    QTask

(aa)   Renato Watches, Inc.

(ab)   Rothstein Family, Ltd.;

(ac)   Sea Club Ocean Resort Hotel, Inc.;

(ad)   SPAC Investments, LLC;

(ae)   TB22 Mario's, Inc.;

(at)   TB22N, LLC;

(ag)   TLBN, LLC;

(ah)   UG, LLC;

(ai)   Uniglobe Environmental Solutions, Inc.;

(aj)   VGS1, LLC;

(ak)   V Georgio Spirits, LLC;

(al)   WAWW 13, LLC;

(am)   Rothstein Rosenfeldt Adler, P.A., located in Florida; and

38

(an)    Rothstein Rosenfeldt Adler, located in Venezuela;

**F.    Contributions ("C")**

(C1)    $6,000 in campaign contributions made to Alex Sink and voluntarily offered, and turned over, to the United States on behalf of Alex Sink;

(C2)    $40,000 in campaign contributions to Republican Party of Florida, "Florida" account and voluntarily offered, and turned over, to the United States by the Republican Party of Florida;

(C3)    $10,000 in campaign contributions to Republican Party of Florida, "Federal" account and voluntarily offered, and turned over, to the United States by the Republican Party of Florida;

(C4)    $90,000 in campaign contributions to Republican Party of Florida and voluntarily offered, and turned over, to the United States by the Republican Party of Florida;

(C5)    $5,000 in campaign contributions to Republican Party of Florida by Rothstein business entity known as WAWW and voluntarily offered, and turned over, to the United States by the Republican Party of Florida;

(C6)    $800,000 Charitable Donation to Joe DiMaggio Children's Hospital, which hospital advised the United States of the donation from the Rothstein Family Foundation for the purpose of facilitating forfeiture;

(C7)    $1,000,000 Charitable Donation to Holy Cross Hospital, which hospital advised the United States of the donation from the Rothstein Family Foundation for the purpose of facilitating forfeiture;

(C8)    $9,600 in campaign contributions to Governor Charlie Crist, voluntarily offered, and turned over, to the United States by the office of Charlie Crist; and

39

(C9)    All funds voluntarily turned over to the United States (IRS/FBI), since in or about October 28, 2009, in response to publicity regarding Scott W. Rothstein, including $5,000 from "CAKK."

**G.    Miscellaneous ("M"):**

(M1)    All premiums paid by or on behalf of Scott W. Rothstein, to Massachusetts Mutual Life Insurance Company, as set forth in 09-61915-CIV-JORDAN (SDFL);

(M2)    American Express rewards points totaling 20,920,701 as of 10/31/09 for account #1MXXXX4822; and

(M3)    All property, other than "funds," including watches and cars, voluntarily turned over to the United States (IRS/FBI) since in or about October 28, 2009 in response to publicity regarding Scott W. Rothstein, including watches turned over by "JH" and "MBF."

40