[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11486
Non-Argument Calendar
_____

D.C. Docket No. 8:14-cr-00123-CEH-MAP-2


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ENESHIA CARLYLE,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(May 30, 2019)

Before BRANCH, HULL and JULIE CARNES, Circuit Judges.

PER CURIAM:

After pleading guilty to wire fraud, in violation of 18 U.S.C. §§ 1343 and 2,

and aggravated identity theft, in violation of 18 U.S.C. §§ 1028A and 2, defendant

Eneshia Carlyle appeals the district court's amended forfeiture money judgment imposed pursuant to 18 U.S.C. § 981(a)(1)(C).  This Court vacated Carlyle's original forfeiture money judgment and remanded in light of the Supreme Court's recent decision in Honeycutt v. United States, 581 U.S. ___, 137 S. Ct. 1626 (2017).  On remand, the district court entered an amended forfeiture money judgment in the amount of $1,457,293.95.

On appeal, Carlyle contends that on remand, the district court misapplied the Honeycutt standard and that the resulting amended forfeiture money judgment violated the Eighth Amendment's Excessive Fines Clause because it is grossly disproportionate to her offense.  After review, we affirm the district court's entry of the amended forfeiture money judgment.

## I.  BACKGROUND FACTS

### A.    Fraud Scheme and Guilty Plea

Defendant Carlyle and her husband and codefendant, James Lee Cobb, engaged in a scheme to obtain fraudulent tax refunds from the Internal Revenue Service ("IRS") using stolen personal identifying information ("PII"), commonly referred to as stolen identity refund fraud.  Much of the PII Carlyle and Cobb used was gleaned from patients' medical records.  The codefendants loaded the fraudulently obtained tax refunds onto fraudulent debit cards, which they then used to make purchases or to withdraw funds from ATMs.  The scheme was uncovered

2

when police pulled Cobb over in a routine traffic stop and found some of the debit cards and cash transfer receipts in his car.

During a subsequent search of Cobb and Carlyle's marital home, officers found, inter alia, more evidence of the stolen identity refund fraud, including debit cards and stolen PII, as well as the keys to two storage units leased to, and accessed by, Carlyle. Officers searched the storage units and found trash bags full of patient information from various healthcare facilities and information about individuals' deaths and social security numbers. One storage unit also held a red Mercedes registered to Carlyle. Inside the car's trunk, officers found a cheetah-print purse belonging to Carlyle that contained debit cards with various names, patient medical records, utility bills, and social security cards.

Cobb and Carlyle were charged in a ten-count superseding indictment. Carlyle entered a negotiated guilty plea to one count of wire fraud and one count of aggravated identity theft. At her plea hearing, Carlyle admitted, among other things, that: (1) she conspired with her husband Cobb and others to commit the stolen identity refund fraud scheme; (2) she and her husband "together" filed the false tax returns with the IRS to get the refunds; (3) she and her husband used laptop computers and a "hot spot" device to file the false tax returns electronically; (4) she and her husband accessed the refunds by, among other methods, loading them onto pre-paid debit cards; and (5) she and Cobb caused those debit cards to

3

be mailed into the Middle District of Florida, "where they were ultimately received by CARLYLE and Cobb."

Carlyle also admitted that: (1) during the search of her marital residence, law enforcement found the keys to her storage unit in her purse; (2) workers at the storage unit office identified Carlyle from a photograph and told law enforcement that she "directly accessed both storage units"; (3) law enforcement found evidence of the stolen identity refund fraud scheme in her storage units, including PII and pre-paid debit cards in trash bags and additional pre-paid debit cards in the trunk of her Mercedes; and (4) many of the fraudulent debit cards "had direct connections to Carlyle," such as surveillance video of Carlyle using debit cards at ATMs to make withdrawals, recorded phone calls in which Carlyle attempted to unblock funds from debit cards, or documented calls from a phone number linked to Carlyle accessing debit cards via telephone.

As part of her plea agreement, Carlyle agreed to: (1) a forfeiture money judgment "in an amount to be determined at sentencing but not less than $610,000, representing the amount of proceeds obtained as a result of the scheme"; and (2) forfeiture of Carlyle's Mercedes found in the storage unit, "which was derived from" the proceeds.[1]  The IRS later calculated a total loss of $1,820,759 and

---

[1]Carlyle's plea agreement also contained a limited sentence appeal waiver and a forfeiture appeal waiver, but the government has not sought to enforce these waivers on appeal and instead has fully briefed the merits of the forfeiture issues.  Therefore, we do not address

4

requested restitution in that amount.  Unable to locate any other property derived from the wire fraud scheme, the government sought a preliminary forfeiture order for Carlyle's Mercedes and for a money judgment against Carlyle in the amount of $1,820,759, pursuant to Federal Rule of Criminal Procedure 32.2(b), 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c).

## B.    Sentencing and Original Forfeiture Money Judgment

At sentencing, the district court determined that the intended loss for Carlyle's offenses was $5,613,549 and the actual loss was $1,820,759.  The district court imposed a 114-month sentence for Carlyle's wire fraud offense and a consecutive 24-month sentence for Carlyle's aggravated identity theft offense, for a total 138-month sentence.  The district court also ordered restitution of $1,820,759 to the IRS, to be paid jointly and severally with Cobb.  The government asked the district court also to impose the forfeiture money judgment of $1.8 million jointly and severally with Cobb.  The government explained that the $610,000 amount in Carlyle's plea agreement was based on an earlier IRS calculation, but that the IRS had since received more records and had recalculated the loss amount.

---

whether the issues Carlyle raises on appeal are barred by either waiver.  See United States v. Valnor, 451 F.3d 744, 745 n.1 (11th Cir. 2006).

After sentencing, the district court entered a written order granting the government's motion for a forfeiture money judgment in the amount of $1,820,759 and for a preliminary order of forfeiture for the Mercedes.  The order held Carlyle "jointly and severally liable" with her husband Cobb for the forfeiture money judgment.

## C.    Carlyle's First Appeal of Forfeiture Money Judgment

While Carlyle's appeal of the forfeiture money judgment was pending, the Supreme Court decided Honeycutt, which involved 21 U.S.C. § 853(a)(1), a criminal forfeiture statute applicable in certain serious drug cases.  581 U.S. at ___, 137 S. Ct. at 1630, 1632.  In Honeycutt, the Supreme Court rejected joint and several liability among co-conspirators under 21 U.S.C. § 853, holding that when a defendant is part of a conspiracy, § 853 limits forfeiture to tainted property "the defendant himself actually acquired as the result of the crime."  Id. at ___, 137 S. Ct. at 1635.

In Carlyle's initial appeal, the government conceded Honeycutt necessitated a remand.  Accordingly, this Court vacated Carlyle's original forfeiture money judgment and remanded to the district court to determine in the first instance whether Honeycutt applied to Carlyle's case and to conduct any factfinding necessary to determine the appropriate amount of monetary forfeiture to be

6

imposed upon Carlyle.  United States v. Carlyle, 712 F. App'x 862, 865 (11th Cir. 2017).

## D.    Post-Remand Evidentiary Hearing

On remand, the district court held an evidentiary hearing, at which the parties agreed, and the district court concluded, that Honeycutt applied to Carlyle's forfeiture under 18 U.S.C. § 981(a)(1)(C).  The district court then heard testimony from Special Agent Glen Hayag from the IRS Criminal Investigation Division.

Special Agent Hayag detailed the search of Carlyle's home and storage units and explained how he computed the loss amount that was directly traceable to Carlyle's storage units.  In particular, Special Agent Hayag explained that during the original investigation, he worked with the IRS Scheme Development Center to identify which of the 7,000 pieces of PII found in the marital home and Carlyle's storage units were used to obtain fraudulent tax refunds.  Special Agent Hayag then determined which of those refunds were sent to debit cards and had other characteristics of being part of the fraud scheme.  As a result of his analysis, Special Agent Hayag narrowed the result to 805 pieces of PII from the marital home and storage units that were used to claim $5,613,549 in tax refunds and receive approximately $1.8 million in tax refunds.

Special Agent Hayag testified that between 140 and 150 debit cards using stolen PII were found in Carlyle's storage unit, including 68 debit cards found

inside her cheetah-print purse.  In addition, officers found handwritten lists of PII, along with bank account and routing numbers or other notations indicating that tax returns had been successfully filed and tax refunds had been directed to debit cards.  To prepare for the post-remand evidentiary hearing, Special Agent Hayag further narrowed the fraudulent refunds to only those traceable to the PII found in Carlyle's storage unit and determined that $3,058,917.85 had been claimed and $1,457,293.95 had been paid using that PII.  That $1.4 million number excluded fraudulent refunds connected to debit cards and PII found in the marital home.

## E.    Amended Forfeiture Money Judgment

Afterward, the district court entered an amended forfeiture money judgment. The district court reiterated its conclusion, agreed to by the parties, that Honeycutt applied to Carlyle's forfeiture under 18 U.S.C. § 981(a)(1)(C).  The district court found that the government had proved by a preponderance of the evidence "that Carlyle, within the meaning of Honeycutt, personally obtained $1,457,293.95 as a result of the wire fraud scheme to which she pleaded guilty."

The district court's supporting findings of fact included that: (1) Carlyle admitted (as part of her guilty plea) to aiding her husband Cobb in the execution of the wire fraud scheme, including by filing false tax returns using stolen identities and "access[ing] the refunds from pre-paid cards loaded with fraudulent refunds mailed to her and Cobb"; (2) Carlyle also admitted to personally recovering

8

$610,000; (3) Carlyle owned and leased the storage unit, and the Mercedes inside was registered to Carlyle; (4) the purses found inside the storage unit contained debit cards and debit card mailers in various individuals' names and sheets of paper containing stolen PII; (5) there was no evidence that Cobb used or carried a purse or that any of the items in the storage unit belonged to Cobb; (5) Agent Hayag, based on his review, "concluded that the total amount of money obtained through the PII and fraudulent tax returns amounted to $1,457,293.95"; and (6) "[t]his total derives only from the PII found in the storage unit, and not the residence Carlyle shared with Cobb."

## II.  DISCUSSION

### A.    Honeycutt Claim

When a defendant is convicted of a criminal offense for which civil forfeiture is authorized, the district court shall "order the forfeiture of . . . property as part of the sentence in the criminal case."  28 U.S.C. § 2461(c).  The civil forfeiture statute authorizes forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."  18 U.S.C. § 981(a)(1)(C).  Section 1956's definition of "specified unlawful activity" includes offenses listed in 18 U.S.C. § 1961(1), which includes wire fraud under 18 U.S.C. § 1343.  See 18

9

U.S.C. §§ 1956(c)(7)(A), 1961(1).  At sentencing, the government must prove the elements of forfeiture by a preponderance of the evidence.  See United States v. Hasson, 333 F.3d 1264, 1277-78 (11th Cir. 2003) (addressing forfeiture under 18 U.S.C. § 982(a)(1)).[2]

On appeal, Carlyle contends the district court erred in concluding that $1,457,293.95 represented the proceeds she personally obtained from the fraud scheme.  Carlyle does not dispute that the $1,457,293.95 forfeiture money judgment reflects the amount of fraudulent tax refunds connected to PII found in her storage unit.  Additionally, the parties continue to agree, as they did in the district court, that Honeycutt applies to forfeitures under § 981(a)(1)(C).  Thus, for purposes of this appeal, we assume arguendo, and do not decide, that the standard announced in Honeycutt applies to forfeiture judgments under § 981(a)(1)(C).[3]

---

[2]Although Hasson addressed a criminal forfeiture statute, its reasoning—that at sentencing the preponderance standard generally applies—dictates that the government bears the same burden of proof for civil forfeitures sought in criminal sentencings.

[3]This Court has not yet considered whether Honeycutt applies to civil forfeitures under § 981(a)(1)(C).  We have, however, concluded that the reasoning of Honeycutt applies to criminal forfeitures under 18 U.S.C. § 982(a)(7), pertaining to healthcare offenses.  See United States v. Elbeblawy, 899 F.3d 925, 933, 940-42 (11th Cir. 2018), cert. denied, ___ U.S. ___, 139 S. Ct. 1322 (2019) (remanding for a new forfeiture determination).
    Three Circuits have addressed whether Honeycutt applies to § 981(a)(1)(C) civil forfeitures, but they do not agree.  See United States v. Peithman, 917 F.3d 635, 652 (8th Cir. 2019) (concluding Honeycutt does not apply to § 981(a)(1)(C) based on that statute's textual differences with 21 U.S.C. § 853); United States v. Sexton, 894 F.3d 787, 799 (6th Cir.), cert denied, ___ U.S. ___, 139 S. Ct. 415 (2018) (same); but see United States v. Gjeli, 867 F.3d 418, 427-28 (3d Cir. 2017), cert. denied, ___ U.S. ___, 138 S. Ct. 700 (2018) (concluding Honeycutt does apply to § 981(a)(1)(C) based on that statute's textual similarities with 21 U.S.C. § 853).  We need not resolve this issue here, however, because even assuming Honeycutt's "personally

Under <u>Honeycutt</u>'s standard, a defendant involved in a conspiracy can be held liable, for forfeiture purposes, only for tainted property the defendant herself "obtained" as a result of the crime. <u>See</u> 581 U.S. at ___, 137 S. Ct. at 1635. To define the term "obtain" in § 853(a)(1), the Supreme Court in <u>Honeycutt</u> looked to common dictionary definitions, such as "[t]o come into the possession or enjoyment of," "to get or acquire," or "to procure or gain, as the result of purpose and effort." <u>Id.</u> at 1632 (internal quotation marks omitted). The Supreme Court further stated that a defendant could "obtain" the property directly or indirectly through an intermediary. <u>Id.</u> at 1633. By way of example, the Supreme Court suggested a college student delivering drugs for a "mastermind" should not be held liable for the entire $3 million drug scheme if the college student received only $3,600 for his participation. <u>Id.</u> at 1631-32. The mastermind, on the other hand, "ultimately 'obtains'" the $3 million, whether he receives it directly from drug purchasers or arranges to have purchasers pay the college student as an intermediary. <u>Id.</u> at 1633.

Here, the district court properly found that Carlyle personally obtained $1,457,293.95 as a result of the stolen identity refund fraud scheme.[4] Based on

---

obtained" standard applies, the district court correctly concluded that the government had met its burden by a preponderance of the evidence with respect to Carlyle.

[4]We review a district court's legal conclusions regarding forfeiture <u>de novo</u> and its findings of fact for clear error. <u>Elbeblawy</u>, 899 F.3d at 933.

Carlyle's own admissions as part of her guilty plea and on Special Agent Hayag's testimony, the district court could properly conclude that it was more likely than not that Carlyle "obtained," within the meaning of Honeycutt—that is, she came into possession and enjoyment of, acquired, or procured—the $1.4 million in fraudulent tax refunds traced to the debit cards and stolen PII found in her storage units, in her Mercedes, and in her purses.  See Honeycutt, 581 U.S. at ___, 137 S. Ct. at 1632.

Specifically, Carlyle admitted that both she and her husband together electronically filed false tax returns using a laptop and a hot spot device, that she accessed the resulting fraudulently obtained refunds by loading them onto pre-paid debit cards, which she and her husband then had mailed to Florida, where the debit cards were "ultimately received by" both her and her husband.  Based on Special Agent Hayag's testimony and Carlyle's own admissions, Carlyle kept PII and pre-paid debit cards used in the fraud scheme in her storage unit, which she directly accessed with keys found in her purse.  Debit cards and documents containing PII were found in her cheetah-print purse and the trunk of her Mercedes, among other places in the storage units.  Surveillance videos, ATM photographs, and recorded or documented phone calls directly connected Carlyle to many of the debit cards found in her storage units.  This evidence showed that Carlyle accessed the stolen refunds on those debit cards either at ATMs, over the telephone, or by using them

12

to make purchases at retail stores. And, according to Special Agent Hayag, the $1,457,293.95 amount in the forfeiture money judgment represented only the fraudulent refunds traced to debit cards and PII found in Carlyle's storage unit.

These facts are amply sufficient to support the district court's finding, by a preponderance of the evidence, that Carlyle personally obtained those fraudulent refunds. Although Carlyle argues that nearly all of the proceeds from the scheme "could have ended up, and almost certainly did end up, in Cobb's pocket" as the fraud scheme's leader, Carlyle did not present any evidence to support this claim.[5] Nor was the district court required to ignore the fact that Carlyle and Cobb, in addition to engaging in the fraud scheme together, were also married and living together. Cobb may have been the leader of the scheme, but he and Carlyle often were together when they used fraudulent debit cards to make withdrawals at ATMs or to make purchases at retail locations, and Carlyle posed as the debit cardholder on at least one occasion to try to unfreeze funds on a card loaded with fraudulently obtained refunds. Absent some other evidence to the contrary, it is reasonable to infer from the evidence in the record that Carlyle possessed and enjoyed the fruits of her own efforts.

---

[5]In fact, apart from stipulating that she personally obtained $100,000 from the scheme, Carlyle did not present any evidence at the hearing.

13

In this way, Carlyle's case is distinguishable from Honeycutt. In Honeycutt, the defendant managed sales and inventory at his brother's hardware store. Id. at ___, 137 S. Ct. at 1630. The hardware store sold large quantities of Polar Pure, a water purification product containing iodine, which the brothers knew or had reason to believe would be used to manufacture methamphetamine. Id. The Supreme Court concluded the defendant, as only a manager, could not be held jointly and severally liable with his brother for the store's profits from the illegal sales given that the government had conceded the defendant "had no ownership interest in his brother's store and did not personally benefit from the Polar Pure sales." Id. at ___, 137 S. Ct. at 1635.

Here, the government made no such concession. Instead, the evidence the government presented at the evidentiary hearing, along with Carlyle's admissions, indicate that Carlyle, unlike the store manager in Honeycutt, actually benefited from the wire fraud scheme because she withdrew money from ATMs using fraudulent debit cards, purchased a Mercedes with fraud proceeds, and even stipulated that she received $100,000 from the scheme.

Carlyle couches her argument in terms of the district court "misinterpret[ing]" Honeycutt, and she suggests the district court impermissibly found that she and Cobb "jointly obtain[ed]" the $1,457,293.95. The record makes clear, however, that on remand, the district court understood that, once it

14

determined Honeycutt applied, it was required to make fact findings as to the amount of the proceeds Carlyle personally obtained during the fraud scheme, and that is exactly what the district court did. Carlyle's argument on appeal is really a challenge to the sufficiency of the evidence supporting the district court's finding that she personally obtained $1,457,293.95.[6]

There also is no merit to Carlyle's argument that the district court erred in ordering that Cobb's forfeiture payments be offset against Carlyle's. Specifically, the district court's forfeiture order stated that "[t]he value of any assets or proceeds forfeited from Co-Defendant James Cobb shall be offset against [Carlyle's] forfeiture liability. In no event shall the United States collect more than $1,820,759.00 from the Defendants, collectively, towards forfeiture ordered in this case."

During the evidentiary hearing, Carlyle argued that a forfeiture money judgment against her in the amount of $1,457,293.95 could result in the government collecting more than the total proceeds of the scheme. The district court added the offset provision to ensure that the government collected no more than the $1.8 million Special Agent Hayag had testified was the total amount of the

---

[6]Because the district court's forfeiture money judgment held Carlyle liable only for the fraud proceeds the court found she personally obtained and did not find that Carlyle and Cobb "jointly obtained" those proceeds, we need not resolve today whether Honeycutt prohibits codefendants, such as spouses or business partners, from jointly obtaining property subject to forfeiture.

fraud proceeds derived from the evidence found in both the marital residence and the storage units.  The offset provision was particularly important to ensure the government did not over-collect for this scheme because this Court had already affirmed Cobb's forfeiture money judgment, holding him jointly and severally liable with Carlyle for $1.8 million, in 2016, before Honeycutt was decided.  See United States v. Cobb, 842 F.3d 1213, 1220-21 (11th Cir. 2016). Without this offset provision, the government could have recovered $3.2 million, when the loss was only $1.8 million.

## B.    Eighth Amendment Excessive Fines Claim

The Eighth Amendment states that no excessive fines shall be imposed. U.S. Const. amend. VIII.  A forfeiture order imposed at the end of a criminal proceeding due to a conviction constitutes a fine that is subject to the Excessive Fines Clause.  United States v. Seher, 562 F.3d 1344, 1371 (11th Cir. 2009).  A forfeiture order constitutes an excessive fine "if it is grossly disproportional to the gravity of a defendant's offense."  Id. (quotation marks omitted).  To determine whether a fine is grossly disproportional to the defendant's offense, we consider: (1) whether the defendant is in the class of persons at whom the criminal statute was primarily directed; (2) what other penalties were authorized for the offense by the legislature or the Sentencing Commission; and (3) the harm caused by the

defendant.  Id.  We strongly presume that a forfeiture order within the range of fines allowed by Congress for the offense is constitutional.   Id.[7]

A forfeiture money judgment that is greater than the statutory maximum fine is not presumptively invalid but should receive close scrutiny rather than a presumption of constitutionality.  See United States v. Sperrazza, 804 F.3d 1113, 1127 (11th Cir. 2015).  When we have closely scrutinized forfeiture money judgments that exceeded the statutory maximum fine, we have "upheld all forfeitures imposed by district courts in amounts up to twice the maximum authorized fine."  Id.

Here, under Seher's three-factor test, Carlyle's forfeiture money judgment was not grossly disproportionate to her offense.  First, Carlyle is within the class of persons whom the wire-fraud and aggravated-identity-theft statutes were meant to cover.  See Seher, 562 F.3d at 1371.  Carlyle had used the wires and a victim's means of identification to access funds that she had obtained fraudulently from the United States.  See 18 U.S.C. §§ 1028A, 1343.

Second, the amount of Carlyle's forfeiture money judgment was below the statutory maximum fine, and thus is entitled to a presumption of constitutionality. See Seher, 562 F.3d at 1371.  The statutory maximum fine for Carlyle's wire-

---

[7]We review de novo whether a forfeiture order is excessive, in violation of the Eighth Amendment's Excessive Fines Clause.  Seher, 562 F.3d at 1370.

fraud and aggravated-identity-theft convictions was the greater of $250,000 or twice the pecuniary gain or loss resulting from the offenses.  See 18 U.S.C. §§ 1343, 3571(b)(1), (d).  Given that the district court found that the actual loss resulting from Carlyle's offenses was $1,820,759, the statutory maximum fine was $3,642,518.  Although Carlyle's forfeiture money judgment was greater than the top end of her guidelines fine range of $17,500 to $175,000, the Sentencing Commission has stated that the guidelines fine range is intended to support a fine of up to twice the gross gain or loss caused by the offense and that, where that is not the case, an upward departure may be warranted.  See U.S.S.G. § 5E1.2(c)(3) & cmt. n.4 (2014).  Thus, while Carlyle's forfeiture money judgment was greater than her guidelines fine range, an upward departure to impose a forfeiture money judgment equal to the amount of loss caused by the offense would not be grossly disproportionate.  In sum, Carlyle's forfeiture money judgment of $1,457,293.95 represented less than half of the statutory maximum fine and is presumptively constitutional.

Under Seher's third factor, Carlyle's offense caused significant harm to her victims.  See Seher, 562 F.3d at 1371.  According to the presentence investigation report and Special Agent Hayag's testimony, Carlyle and Cobb obtained PII for over 7,000 victims, and officers recovered debit cards in the names of over 350 victims.  Between 140 and 150 debit cards using stolen PII

18

were found in Carlyle's storage units alone.  Carlyle's offenses caused $1.8 million in harm to the public because she received tax refunds for fraudulent returns.  Considering all three <u>Seher</u> factors, we conclude the district court's amended forfeiture money judgment in the amount of $1,457,293.95 was not grossly disproportionate to Carlyle's offense conduct and does not violate the Eighth Amendment.

**AFFIRMED.**